AO 91 (Rev. 11/11)  Criminal Complaint

| | | |
|---|---|---|
| **Sealed**<br>Public and unofficial staff access<br>to this instrument are<br>prohibited by court order | # UNITED STATES DISTRICT COURT<br>for the<br>Southern District of Texas | United States Courts<br>Southern District of Texas<br>FILED<br>*October 23, 2020*<br>David J. Bradley, Clerk of Court |

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Hendry Jimenez Milanes | ) | Case No.  H-20-2092M |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 2015-November 2018___ in the county of ___Harris___ in the

___Southern___ District of ___Texas___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. 1952 | Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Katherine S. Langston, Supervisory Special Agent
*Printed name and title*

Sworn to before me telephonically.

Date: ___10/23/2020___

_____
*Judge's signature*

City and state: ___Houston, Texas___

U.S. Magistrate Judge Peter Bray
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA

v.

Case No.  H-20-2092M

Hendry Jimenez Milanes

## CRIMINAL COMPLAINT

I, Supervisory Special Agent Katherine Langston, the undersigned Complainant, being duly sworn,

states the following is true and correct to the best of my knowledge and belief:

## BACKGROUND AND SUMMARY

1.    On October 10, 2018, YMCA International Services sent a referral to the Houston

Human Trafficking Task Force (HTTF).  The victim, a female Cuban national (hereinafter referred

to as Victim 1) advised YMCA International Services that, in or around April 2018, she was

smuggled into the United States and later forced and coerced to pay her smuggling debt by dancing

and engaging in commercial sex at Houston-area strip clubs.

2.    During interviews with Victim 1, special agents from Diplomatic Security Service

(DSS) and Homeland Security Investigations (HSI) learned that she was solicited in Cuba by

Rasiel Gutierrez Moreno (hereinafter **Moreno**) and Milena del Carmen Hernandez Ortega

(hereinafter **Ortega**).  **Moreno** told Victim 1 "I dedicate myself to taking women to the United

States," and that he would "provide clothing, a job, and a place to live".

3.    On November 1, 2018, **Moreno**, **Mendoza** and **Ortega** were arrested for violations

of 18 U.S.C. § 1594 and 18 U.S.C. § 1591 with respect to Victim 1.  Further investigation revealed

that **Moreno** and **Mendoza** exploited Victim 1 as part of a larger criminal enterprise.  Specifically,

1 of 11

special agents have learned that **Moreno**, accompanied by either Rafael **Mendoza** Labrada (hereinafter **Mendoza**) or Hendry Jimenez **Milanes** (hereinafter **Milanes**), would transport Cuban females who had entered the United States and direct them to apply for asylum.  Once the women arrived in the United States, **Moreno** would inform them of the smuggling debt that they owed him, which was often double or triple the amount it actually cost him to bring the women from Cuba.  The women were then compelled to strip and prostitute at clubs in the Houston area to pay off their smuggling fees to **Moreno**.  Together, **Moreno**, **Mendoza**, and **Milanes** would drive the women to and from the clubs and motels where the women would engage in commercial sex. **Moreno**, **Mendoza**, and **Milanes** used interstate highways to transport the women to and from clubs and motels, and cellular telephones to communicate with them.  The women turned over their proceeds from commercial sex to **Moreno** in order to pay their smuggling debts.

## INTRODUCTION AND AGENT BACKGROUND

4.   I have been a Special Agent with DSS since 2011 and I am currently assigned to the Houston Field Office.  Beginning in 2012, I have served as one of the DSS representatives on the Houston Human Trafficking Task Force.  Prior to DSS, I was a Special Agent with the United States Secret Service beginning in 2002, where I was a certified forensic examiner and a network intrusion investigator.  I have training in the preparation, presentation, and service of criminal arrest and search warrants, and have been involved in the investigation of offenses against the United States, including fraud and related activity in connection with computers, the Internet, smuggling and harboring of illegal aliens, passport and visa fraud, and trafficking of individuals involved in forced labor and commercial sex.  I have participated in hundreds of search warrant executions, arrests of criminals, and have led and assisted on numerous investigations both at the

SBU -LAW ENFORCEMENT

Secret Service and at DSS with an international nexus.

5.     This affidavit sets forth facts, and suggests reasonable inferences from those facts, establishing that there is probable cause to believe that **Milanes** committed violations of the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises (hereinafter "the Travel Act"),  under 18 U.S.C. § 1952, in the Southern District of Texas.  18 U.S.C. § 1952 states in part, whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, including prostitution offenses in violation of the laws of the State in which they are committed or of the United States.

6.     The information in this affidavit is based upon my own knowledge, records furnished to me in my official capacity and information provided by other law enforcement officials.  This affidavit does not contain every material fact that I have learned during the course of this investigation, and is intended to show only that there is sufficient probable cause for the criminal complaint.  The information is based on an ongoing investigation.  Further, in my training and experience investigating commercial prostitution cases involving adult victims, victims are not always cooperative with the investigation out of fear for their family's safety and are often more forthcoming after arrest.

**PROBABLE CAUSE**

**Milanes and Moreno Operate Prostitution Enterprises in Cuba**

7.     **Milanes** and **Moreno**, both Cuban nationals, were operating prostitution enterprises in Cuba prior to coming to the United States.  **Milanes** first began his prostitution

SBU -LAW ENFORCEMENT

enterprise with Victim 2, a Cuban national, whom he met in his hometown of Bayamo, Cuba. **Milanes** and Victim 2 met at a party in Bayamo and began dating.  **Milanes** told Victim 2 that he wanted the couple to make enough money to travel to the United States.  He proposed that he take Victim 2 to Havana, Cuba, where she could make money for the couple by engaging in commercial sex.  At the time, **Moreno**, reputed in Cuba to be a "pimp", had already taken his girlfriend, Victim 3, a minor, to Havana to engage in commercial sex.  Although Victim 2 had never previously engaged in commercial sex, she agreed to travel with **Milanes** to Havana to engage in commercial sex.

8.   In Havana, **Milanes** directed Victim 2 to engage in commercial sex work and provide him with the proceeds.  **Milanes** did not work himself, but instead he took nearly all the money that Victim 2 made by engaging in commercial sex.  The first time that Victim 2 had sex with a client, **Milanes** instructed her what to charge.  **Milanes** also instructed her to take care of herself and protect herself.  **Milanes** would remain nearby when Victim 2 performed dates; once, she got into a "bad situation" and cried out for help, and **Milanes** quickly came to her aid.  On another occasion, when Victim 2 was traveling in a taxi with a client, en route to their sex date, the taxicab driver drove past a police checkpoint.  When the taxicab driver later told **Milanes** that Victim 2 appeared nervous at the checkpoint, **Milanes** physically struck Victim 2.  **Milanes** told her that if she could not "do it" – meaning perform commercial sex – then they would have to return to Bayamo.  **Milanes** also told Victim 2 that he did not want to have to call her mother and tell her that something had happened to Victim 2.

### Milanes Begins a Prostitution Enterprises in Houston

9.   In the spring of 2015, **Milanes** and Victim 2 departed Cuba, en route to the United States, using money that Victim 2 made from commercial sex work, and also money loaned from

their friends and family. Prior to leaving Cuba, **Milanes** assured Victim 2 that she would not have to engage in commercial sex in the United States. The couple followed a smuggling route through Ecuador to the United States. In June 2015, **Milanes** and Victim 2 entered the United States at a border checkpoint in Laredo and claimed asylum. They then made their way to Houston, Texas.

10. In Houston, Texas, **Milanes** and Victim 2 lived with another Cuban man and woman. The Cuban woman, with whom the couple was living, took Victim 2 to get a job as a dancer at Michael's International, a Houston-area strip club. At first, Victim 2 only danced at the club. **Milanes**, who did not have a job, took her to and from the club and collected the money that she made there.

11. After about a month, Victim 2 realized that she could not make enough money to support the couple only by dancing, so she began to engage in commercial sex with the approval of **Milanes**. She would meet clients in the club and engage with them in commercial sex either inside the club itself or at nearby motels. **Milanes** knew that Victim 2 engaged in commercial sex; he would often drop Victim 2 off at the club and, later the same night, pick her up at a nearby hotel, after she finished a commercial sex date. Victim 2 would communicate with **Milanes** about where and when to pick her up by using a cellular telephone. After the couple got home, Victim 2 would give **Milanes** the money that she made from engaging in commercial sex.

12. Throughout the course of their relationship, **Milanes** physically abused Victim 2 on a regular basis. Victim 2 told special agents that their disputes were often connected to **Milanes**' jealousy. Victim 2 described to special agents a particular incident in which **Milanes** picked her up from work at a club and became angry with her because she was drunk. As he drove the car, he began to assault her by striking her with his hands. Once the couple reached their apartment, **Milanes** continued to verbally threaten and strike Victim 2. Victim 2, knowing that

SBU -LAW ENFORCEMENT

**Milanes** would continue to beat her, struck him with a statue in the couples' apartment.

13. Victim 2 told special agents that she tried to make enough money at the club so that **Milanes** would not bother her about their financial bills, i.e., rent, car, insurance, Internet, cellular telephones, and electricity. Victim 2 expressed that she felt frustrated because she had to work at the club while **Milanes** merely stayed at home. At one point, Victim 2 told **Milanes** that she wanted to stop working at the club, but he told her that she could not make enough money working in a normal job making minimum wage.

14. Victim 2 did not feel like she was free to keep the money that she earned at the club to herself. Victim 2 would also hide a small amount of money that she made to send money to her mother in Cuba. Victim 2 felt that if she was single, she would have made enough to support herself by just dancing in the club.

15. In August 2015, **Moreno** and Victim 3 arrived in the United States. **Moreno** and Victim 3 followed a similar smuggling route to that used by **Milanes** and Victim 2, through Ecuador. Moreno contacted Milanes, who sent him $6000 so that **Moreno** and Victim 3 could reach the United States border. At the United States border, **Moreno** and Victim 3 both claimed asylum. **Milanes**, together with another Cuban male, picked up **Moreno** and Victim 3 and drove them to Houston, Texas. **Milanes** then housed **Moreno** and Victim 3 in the apartment that he shared with Victim 2.

16. Victim 2 took Victim 3 to Michael's International to get a job as a dancer. This and other investigations have shown that undocumented women often pay a cash fee to the managers at Michael's International in order to work there prior to obtaining legal employment authorization. At the time, Victim 3 did not have work authorization in the United States. **Milanes** gave **Moreno** $400 USD to give to Victim 3, so that she could pay the club managers in order to

SBU -LAW ENFORCEMENT

begin work at the club immediately.  Like Victim 2, Victim 3 started by only dancing at the club, but less than a month after starting at the club, she began to engage in commercial sex.  Victim 3 went to work at the clubs in order to pay the debt that she and **Moreno** owed **Milanes**, and also to pay the couples' living expenses.  While Victim 3 and **Moreno** lived together in Houston, Moreno never maintained steady employment.  Victim 3 provided the majority of funds used to support them.

17.  When Victim 3 had been dancing and engaging in commercial sex at the club for approximately two months, **Moreno** rented a separate apartment for the couple.  Whenever **Moreno** was not available to drive Victim 3 to work at the club, **Milanes** would drive her.  Special agents have obtained text messages between **Moreno** and Victim 3, in which **Moreno** tells her that **Milanes** is on his way to pick her up.

**Milanes and Moreno Expand Their Unlawful Prostitution Enterprise in Houston**

18.  **Milanes** and **Moreno**, seeing how much money Victim 2 and Victim 3 made by dancing and prostituting at the clubs, began to smuggle other Cuban women into the United States.  Once **Milanes** and **Moreno** brought the women to Houston, Texas, they would send them to work at area strip clubs to pay off their debts.

19.  After Victim 2 ended her relationship with **Milanes**, he worked with **Moreno** to bring another woman, Victim 4, to the United States.  **Milanes** met Victim 4 on a trip home to Cuba, and they became romantically involved.  In February 2018, **Moreno** arranged for Victim 4 and another woman, Victim 5, to travel from Cuba to the United States.  **Moreno** had previously met Victim 5 in Cuba, where she was engaged in commercial sex work.  Victim 4 and Victim 5 flew together, with a third Cuban woman, from Cuba to Cancun, Mexico.  From there, they took a taxi through Mexico to the United States border crossing near Laredo, Texas.

SBU -LAW ENFORCEMENT

20. **Milanes** and **Moreno** met the women in Mexico, before they crossed the United States border. **Milanes** and **Moreno** instructed Victim 4 and Victim 5 what to tell United States immigration officials in order to claim asylum at the border. **Milanes** and **Moreno** then crossed the border separately from the women. Border records show that, on February 14, 2018, at 3:07 PM, **Moreno** and **Milanes** entered the United States in a vehicle through the Laredo, Texas port of entry. Just minutes afterwards, Victim 4 and Victim 5 both entered the United States at the Laredo, Texas port of entry pedestrian gate on February 14, 2018, at 3:13 PM. Further, when Victim 5 entered the United States, she listed **Milanes** as her point of contact in the country, describing him as her "step brother."

21. **Milanes** housed both Victim 4 and Victim 5 at his apartment in Houston, Texas. Immigration documents show that both Victim 4 and Victim 5 reported **Milanes**' address as their residence. Both Victim 4 and Victim 5 owed a smuggling debt to **Moreno**. **Moreno** specifically brought Victim 5 to the United States to be **Milanes** "new wife". **Moreno** brought Victim 5 to the United States because, according to Victim 3, **Milanes**, still unemployed, needed a new woman to pay his rent after his "golden goose", meaning Victim 2, left him. **Moreno** charged Victim 5 a smaller smuggling debt – only $10,000 USD, as opposed to his usual $20,000 - 30,000 USD – because he considered **Milanes** to be family. **Milanes** regularly drove both Victim 4 and Victim 5 to work at Michael's International, and other area strip clubs, so that they could pay their smuggling debt to **Moreno**. **Milanes** also required Victim 5 to make the money that **Milanes** needed for his living expenses.

22. **Milanes** intended the Vicitm 4 and 5 engage in commerical sex. Victim 1 overheard **Moreno** complain that Victim 5 did not make enough money working at the club. **Moreno** complained, in effect, that Victim 5 did not want to "fuck for money" but that she could

not pay his debt by working at McDonald's. **Moreno** stated that **Milanes** needed to take a strong hand with Victim 5 so that she would pay her debt. Victim 1 also overheard **Moreno** state that **Milanes** had beaten Victim 5 on one occasion, when she did not want to work. **Moreno** stated that **Milanes** beat Victim 5 so badly that she had bruises and could not work for some days.[1]

23. Victims 4 and 5 used cellular telephones to communicate with **Milanes** regarding when to pick them up and drop them off from work. Victims 4 and 5 used the money that they made working in the clubs to pay the smuggling debt they owed to **Moreno**.

**Milanes and Moreno Continue Their Unlawful Prostitution Enterprise in Houston**

24. In April 2018, **Moreno** smuggled another Cuban woman, Victim 1, from Cuba to the United States. When she arrived at the United States border in Laredo, she claimed asylum and was then detained. When immigration authorities released her from custody, **Moreno** and **Mendoza** picked her up and drove her to Houston, Texas. Victim 1 and **Mendoza** initially stayed at the apartment **Milanes** shared with Victim 5 in Houston, Texas. After several days of living with **Milanes** and Victim 5, **Mendoza** and Victim 1 moved into the apartment that **Moreno** shared with Victim 3.

25. In Cuba, **Moreno** had told Victim 1 he typically charged no more than $7,000 – 8,000 USD to smuggle an individual from Cuba to the United States. Approximately three days after arriving in Houston, **Moreno** told Victim 1 that she owed him $29,000 USD. Victim 1 told special agents that, shortly after **Moreno** brought her to Houston, he informed her that she would have to dance and prostitute herself at Playmates Cabaret.[2] Both **Moreno** and **Mendoza** gave

---

[1] Agents have not yet approached Victim 5 for an interview. When questioned, Victim 4 told special agents that she engaged in commercial sex work in Cuba, but denied having done so in the United States. Multiple witnesses, however, described Victim 4 as having engaged in commercial sex work in the club, and Victim 4 did describe to agents a relationship she had with a client whom she only met at the club, who often paid her $500 for dances, and with whom she had sex on multiple occasions in the client's office.

[2] Playmates Cabaret, aka Playmates Show Girls Cabaret, is an adult entertainment strip club in Houston, Texas.

SBU -LAW ENFORCEMENT

Victim 1 instructions on how to perform commercial sex acts with clients whom she met at the club. **Moreno** instructed Victim 1 that in order to pay her debt, she would have to take clients to bed. Likewise, **Mendoza** instructed Victim 1 that she would have to take clients to motel rooms and told her that she must use a condom for this work. **Moreno** transported Victim 1 to and from work and his apartment; occasionally he would have **Mendoza** or **Milanes** drive her.

26. **Milanes** asked Victim 1 how much she owed to **Moreno**. She told him that she owed $29,000 USD.

27. **Milanes** intended the Vicitm 1 engage in commerical sex. While engaging in commercial sex at the clubs and motels, Victim 1 used a cellular telephone to communicate with **Moreno**, **Mendoza**, and **Milanes**, about when to pick her up and drop her off. The cellular telephone line that Victim 1 used for this purpose belonged to **Milanes**. **Milanes** charged Victim 1 $50 USD a month to use the line.

28. Following Victim 1's escape from **Moreno**, **Moreno** contacted her family and insisted that Victim 1 must pay her debt. **Moreno**, **Mendoza**, a Cuban woman (**Moreno**'s "second wife"), and another Cuban male then followed Victim 1 to Miami. Agents monitored a conversation between **Moreno** and a family member of Victim 1. **Moreno** stated that Victim 1 owed him $12,000 and had already paid him $18,000. He explained that bringing Cuban women to the United States was his only business. He warned that he could not allow Victim 1 to leave Houston without paying her debt, because the other women working for him would know. He claimed to have sent people to Cuba to speak to Victim 1's family about her debt. **Moreno** said he would permit Victim 1 to stay in Miami and work to pay her debt.

29. Multiple victims have told agents that **Milanes** will do **Moreno**'s bidding – that he believes **Moreno**'s word is law. Multiple victims expressed that if **Moreno** ordered **Milanes** to

SBU -LAW ENFORCEMENT

find them, and persuade them not to cooperate, that **Milanes** would do so.

## CONCLUSION

30.  Based on the foregoing facts and circumstances, I respectfully submit that there is

probable cause to believe that between June 2015 and continuing through in or about October 2020

within the Southern District of Texas – Houston Division, **Hendry Jimenez Milanes** committed

violations of the Travel Act, 18 U.S.C. § 1952.

Respectfully submitted,

Katherine S. Langston
Supervisory Special Agent
United States Department of State
Diplomatic Security Service

Subscribed and sworn to me telephonically this __23_ day of October 2020 at _____a.m./p.m.
in Houston, Texas.

Peter Bray
United States Magistrate Judge

SBU -LAW ENFORCEMENT